**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ____________________

KYLA MOORE, and
TIMOTHY OFFICER,

Plaintiffs,

v.

ALPINE IQ, INC., a Delaware corporation, and
NICHOLAS PASCHAL,

Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

**INTRODUCTION**

1. This is an action for defamation and declaratory judgment against Defendants Alpine IQ, Inc. ("AIQ") and AIQ's Chief Executive Officer, Nicholas Paschal ("Paschal" and, together with AIQ, "Defendants"). Defendants falsely and publicly accused Kyla Moore and Timothy Officer of misappropriating AIQ's intellectual property and breaching their employment agreements. Defendants publicized those false accusations to approximately 100 individuals in the same industry as Ms. Moore and Mr. Officer, intentionally defaming them *per se* and damaging the reputations that Ms. Moore and Mr. Officer worked hard to develop.

2. Ms. Moore and Mr. Officer built their reputations through many years of hard work. Ms. Moore began her career in the nightlife and event planning industry at the age of 17 by marketing large events in New York City before eventually launching her own event-planning and consulting firm in Boston. Mr. Officer began working as a software engineer after college and co-founded multiple companies. Ms. Moore and Mr. Officer eventually teamed up to create

Tablelist, Inc. ("Tablelist"), which is an ecommerce platform that allows users to buy tickets, join guest lists, and make reservations at bars, clubs, and exclusive events, and enables those venues to manage reservations and customer data.

3. After the onset of the COVID pandemic, Ms. Moore and Mr. Officer adapted Tablelist's structure and technology to create an offshoot of Tablelist, which they named "Dispense." Dispense was an ecommerce platform, patterned after Tablelist, that assists retailers in the cannabis industry. Mr. Officer created Dispense's computer software code by duplicating and adapting the computer software code that he had developed for Tablelist.

4. Like Tablelist, Dispense also became a success, so much so that AIQ acquired Dispense (which it renamed "AIQ Ecommerce") and hired Ms. Moore and Mr. Officer to help run the business. Before its acquisition of Dispense, AIQ's primary lines of business merely were cannabis marketing and customer loyalty programs. AIQ's acquisition of Dispense enabled AIQ to expand into the cannabis ecommerce business.

5. A critical aspect of AIQ's acquisition of Dispense and the retention of Ms. Moore and Mr. Officer to work for AIQ was that Ms. Moore and Mr. Officer's rights to Tablelist's intellectual property were **<u>not</u>** transferred to AIQ and Ms. Moore and Mr. Officer could continue to work for Tablelist. In short, Defendants knew that the Dispense code AIQ had acquired was based on Tablelist's code and that Ms. Moore and Mr. Officer would continue to work for Tablelist, including updating and refining Tablelist's code.

6. Under the leadership of Paschal, AIQ Ecommerce struggled. In order to help AIQ's marketing and customer loyalty businesses enter the nightlife space, Ms. Moore, Mr. Officer, and their colleagues at AIQ — at Paschal's direction and oversight — integrated certain features of Tablelist into AIQ. Ms. Moore even shared Tablelist's nightlife client lists, which

were the product of her many years of hard work and stellar reputation in the nightlife industry, with AIQ in order to expand AIQ's business.

7. Suddenly, without any warning, AIQ summarily terminated Ms. Moore and Mr. Officer's employment on April 30, 2026. Both had been employed at will, so AIQ was permitted to do that. But Paschal went way beyond that. Instead of simply informing AIQ's employees that Ms. Moore and Mr. Officer no longer were employed with AIQ, Paschal gratuitously and falsely sent a message to approximately 100 AIQ employees accusing Ms. Moore and Mr. Officer of stealing AIQ's computer software code, breaching AIQ's trust, violating their contracts with AIQ, and putting AIQ, its customers, and its intellectual property at risk. Those defamatory statements quickly spread both inside and outside AIQ and throughout the technology industry.

8. Paschal's statements were false and defamatory. Ms. Moore and Mr. Officer did not misappropriate AIQ's code and were permitted to continue to work at Tablelist, including using and modifying the Tablelist computer software code upon which the Dispense/AIQ Ecommerce code had been based. Any similarity or overlap between the Tablelist and Dispense/AIQ Ecommerce codes existed because, among other things, (i) the Dispense/AIQ Ecommerce code was based upon the Tablelist code, (ii) the author of both codes was the same person (Mr. Officer) and he continuously updated both codes, and (iii) the ongoing Tablelist/AIQ integration exercise that Paschal himself had directed and overseen required matching up portions of the two codes.

9. Paschal's statements were defamatory *per se*, were damaging to Ms. Moore's and Mr. Officer's reputations, and caused Ms. Moore and Mr. Officer mental anguish and emotional distress from having their reputations damaged and being falsely accused of fraudulent conduct.

10. In addition to damages, Plaintiffs seek a declaration that they did not (i) misappropriate any AIQ code; (ii) infringe any of AIQ's purported copyrights in its code; or (iii) breach their contracts with AIQ.

## THE PARTIES

11. Plaintiff Kyla Moore is a resident of the state of New York. Ms. Moore has lived and worked in New York since 2015. Ms. Moore is one of the co-founders of Tablelist (the other co-founder is Mr. Officer) and is its Chief Executive Officer. She also co-founded Dispense with Mr. Officer. Before AIQ's acquisition of Dispense, Ms. Moore was Dispense's Chief Executive Officer. After AIQ's acquisition of Dispense, Ms. Moore held multiple positions at AIQ, including President of Ecommerce.

12. Plaintiff Timothy Officer is a resident of the state of New Hampshire. Mr. Officer has lived and worked in New Hampshire since 2020. Mr. Officer co-founded Tablelist with Ms. Moore and is its Chief Technology Officer. He also co-founded Dispense with Ms. Moore. Before AIQ's acquisition of Dispense, Mr. Officer was Dispense's Chief Technology Officer. After AIQ's acquisition of Dispense, Mr. Officer held multiple positions at AIQ, including President of Engineering, Ecommerce.

13. Defendant Alpine IQ, Inc. is a Delaware Corporation with its headquarters and principal place of business in Broomfield, Colorado. AIQ's most senior officers, including its co-founder and Chief Executive Officer (Defendant Paschal), co-founder and Chief Expansion Officer (West Paschal), and Chief Financial Officer (J.K. Hullett), manage the company from Colorado.

14. Defendant Paschal is a resident of Littleton, Colorado. Paschal is the Chief Executive Officer of AIQ.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs and there is complete diversity. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1338(a) because Plaintiffs' claims for declaratory judgment that they did not misappropriate any of AIQ's copyrighted code or infringe AIQ's copyright arise under the Constitution and laws of the United States. This Court has supplemental jurisdiction over Plaintiffs' state law and other declaratory judgment claims pursuant to 28 U.S.C. § 1367(a) because the same transactions and occurrences that form the basis of the federal claims also form the basis of the state law and declaratory judgment claims.

16. This Court has personal jurisdiction over Defendants because Defendants are domiciled in the state of Colorado. This Court also has personal jurisdiction over Defendants because, upon information and belief, the defamatory statements Paschal made on his own and AIQ's behalf were made from Colorado and directed, in part, to third parties located in Colorado. This Court also has personal jurisdiction over AIQ because this dispute arises out of and is related to Ms. Moore's and Mr. Officer's employment agreements, which contain forum selection provisions stating that AIQ consents to the jurisdiction of the Colorado federal courts.

17. Venue is appropriate in this district under 28 U.S.C. § 1391(b)(1) because all defendants are residents of the state of Colorado and of this district. Venue is also appropriate in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL BACKGROUND

### A. Ms. Moore's and Mr. Officer's Careers in the Nightlife and Event Planning Industry and the Creation of Tablelist and Dispense

18. At the age of 17, Ms. Moore began her career in the nightlife and event planning industry by marketing large events in New York City, including Eminem, Jennifer Lopez, and Busta Rhymes for Sound Factory and Exit nightclubs. After moving to Boston, Ms. Moore worked full-time during college at an event-planning company, Rafanelli Events. Ms. Moore worked closely with Boston's top venues and earned a reputation as a trusted business partner within the nightlife, event planning, and hospitality industries. This led to Ms. Moore's next job at Speakeasy Group where she was Director of Events and opened and managed successful bars and clubs in Boston, including those at the Copley Square Hotel and W Hotel Boston. Having developed strong business relationships and a reputation as a trustworthy expert in the industry, Ms. Moore left Speakeasy Group to launch EventBos, an event planning and consulting firm for the Boston area.

19. Mr. Officer began his career as a software engineer after college working at a series of software companies. Mr. Officer is an entrepreneur and used his computer technology expertise to co-found multiple companies.

20. During her years in the nightlife industry, Ms. Moore noticed the archaic nature of the industry's ticketing, reservations, and guest management systems. In 2013, Ms. Moore co-founded Tablelist to modernize nightlife ticketing, reservations, and guest management. In 2014, Mr. Officer joined Ms. Moore as a co-founder. They developed Tablelist into a platform that lets customers book tables, tickets, guest-list spots, and bar tabs at nightclubs, lounges, bars, and other upscale venues while simultaneously allowing the venues to manage ticketing, guest lists, staff, and table reservations.

21. In 2016, Tablelist acquired NightPro, a venue management system, which was built out into TablelistPro — shifting the company's focus towards business-to-business venue

management software and giving venues dynamic pricing, table/capacity management, and back-office tools, along with centralized customer relationship management ("CRM"), booking widgets, customer chat, and other features.

22. Today, Tablelist works with hundreds of venues across 30 countries. It processes more than $30 million in gross merchandise value annually and has processed over $200 million in lifetime transactions.

23. Ms. Moore and Mr. Officer's building of Tablelist was a large, multi-year effort. Ms. Moore and Mr. Officer raised capital from investors and grew a team of more than 20 people spanning engineering, design, and advertising. It required significant efforts to code Tablelist's many features across both web and mobile platforms. Beyond coding the software itself, a significant amount of work was done on the ground — traveling to venues, working the floor alongside venue staff, and learning nightlife operations firsthand to ensure that Tablelist matched customers' expectations.

24. In the wake of the COVID pandemic, nightclubs closed and events came to a sudden halt. True to their entrepreneurial spirit, Ms. Moore and Mr. Officer recognized the opportunity to utilize the Tablelist infrastructure to bring a hospitality-driven and customer-focused platform to assist retailers in the cannabis industry. Thus, Ms. Moore and Mr. Officer created Dispense.

25. Dispense initially was not a separate company but, rather, a project within Tablelist. Tablelist and Dispense operated in two separate industries: Tablelist operated in the nightlife and event industry, while Dispense operated in the cannabis industry. They did not compete with each other.

26. From a programming perspective, Dispense was created as a "fork" of Tablelist. Forking is the process of duplicating existing code so that it can be adapted into a new project.

27. In essence, to take advantage of the significant investment that Tablelist's team had made over the years, Ms. Moore and Mr. Officer created Dispense by using and then modifying Tablelist's code. For example, Tablelist's tickets, packages, and inventory system became Dispense's cannabis inventory; Tablelist's reservations system became Dispense's orders system; Tablelist's consumer browsing and checkout menu became Dispense's cannabis ecommerce menus; and Tablelist's B2B venue dashboard became Dispense's store admin dashboard. Because Dispense was forked from Tablelist, Dispense inherited Tablelist's source code, architecture, and functionality.

28. Dispense was a big success. The platform expanded across multiple states (Illinois, Michigan, New Jersey, Massachusetts, Ohio, and others) and served hundreds of retailers across the country. Dispense raised a $2 million seed round from a notable investor group that included NextView Ventures, Poseidon Asset Management, Achari Ventures, and Arrive (a venture arm of Roc Nation).

29. Ms. Moore and Mr. Officer worked with Tablelist's shareholders and investors to split Dispense into a separate company. As part of this process, Dispense Software, Inc. and Tablelist entered into a contribution agreement regarding Dispense's intellectual property rights. Dispense received intellectual property rights only with respect to intellectual property used solely for Dispense's cannabis dispensary management platform and did not receive any intellectual property rights in Tablelist's infrastructure or data or any technology shared between Tablelist and Dispense.

### B. AIQ's Acquisition of Dispense

30. The success of Dispense attracted AIQ's attention. Paschal and Ms. Moore began conversations regarding how the two companies would be a good fit. On August 29, 2022, AIQ announced its partnership and forthcoming integration with Dispense. AIQ touted that the "integration provides customers with best-in-class loyalty programs allowing seamless access to rewards and loyalty points — a huge win for customer satisfaction" and the merger "enables cannabis businesses to sell online, increase organic traffic, build customer relationships, and scale." In August and September of 2023, AIQ and Dispense began discussing a merger. During merger negotiations, Plaintiffs disclosed the division of Tablelist's and Dispense's intellectual property rights to Defendants. The merger between AIQ and Dispense closed in February 2024.

31. As part of the merger, Ms. Moore and Mr. Officer agreed to continue leading the Dispense operations, which AIQ renamed "AIQ Ecommerce," and received equity in AIQ. They signed employment agreements (the "Employment Agreements") and confidential information and invention assignment agreements (the "Confidential Information and Invention Assignment Agreements") with AIQ (collectively the "Employment and Confidentiality Agreements"). The Employment Agreements provided that Ms. Moore and Mr. Officer were allowed to continue working for Tablelist unless Tablelist competed with AIQ or their work for Tablelist interfered with their employment at AIQ. Just as Tablelist did not compete with Dispense, it did not and has never competed with AIQ's business.

32. The Employment Agreements also contained forum selection provisions providing that any disputes "arising out of, related to, or in any way connected with" Ms. Moore and Mr. Officer's "employment with [AIQ]" and "any other relationship between [Ms. Moore and Mr. Officer] and [AIQ]" will be litigated in Colorado federal court and expressly stating that AIQ consents to the jurisdiction of the Colorado federal courts.

33. Similarly, the Confidential Information and Invention Assignment Agreements expressly **excluded** all inventions related to Tablelist from the intellectual property rights that Ms. Moore and Mr. Officer assigned to AIQ and provided that they were allowed to continue working for Tablelist unless Tablelist competed with AIQ or their work for Tablelist interfered with their employment at AIQ.

**C. Ms. Moore and Mr. Officer Bring Their Skills and Expertise to AIQ**

34. At AIQ, Ms. Moore worked first as President of Ecommerce from February 2024 to September 2024. She oversaw AIQ's ecommerce team through the post-M&A transition, helping transition the team into their new roles within AIQ, and evaluated new market opportunities. She then transitioned to President of Growth from October 2024 to November 2025, where she was responsible for helping launch AIQ into markets outside of cannabis. In October 2025, Ms. Moore indicated her desire to step down from a full-time role with AIQ. Accordingly, she took on the role of New Markets Advisor (from December 2025 until her termination on April 30, 2026) where she leveraged her Tablelist relationships specifically to help bring AIQ's products into the nightlife space. Far from having Tablelist compete with AIQ, Ms. Moore, as described below, leveraged her relationships and extensive expertise in the nightlife industry to assist AIQ in trying to expand into the nightlife area. None of Ms. Moore's positions at AIQ involved coding. Ms. Moore has never accessed any AIQ code.

35. At AIQ, Mr. Officer worked as President of Engineering, Ecommerce from February 2024 to February 2026. Mr. Officer managed three developers and one quality assurance engineer while also serving as the primary hands-on engineer for the ecommerce platform. He was responsible for a significant portion of the product, handled operational and production issues, and managed releases and deployments. Mr. Officer continued functioning as

the technical lead for the entire AIQ Ecommerce platform just as he did for Dispense, while also managing the engineering team.

36. In February 2026, while Mr. Officer was still serving as President of Engineering for the ecommerce division, Paschal, AIQ Chief Operating Officer Eleanor Lynch ("Lynch"), and AIQ Chief Technology Officer Shahzil Abid ("Abid") directed Mr. Officer to reduce his four-person team by two employees. Mr. Officer questioned the directive, including whether the reductions were related to the financial performance of the ecommerce business. Until that point, Mr. Officer had been provided little to no information regarding the ecommerce division's financial performance and AIQ's leadership had never said that the division's performance was a significant concern. Moreover, the two employees whom Paschal wanted to terminate were the only two female engineers at the company.

37. Mr. Officer declined to personally terminate the employees. Instead, he proposed to AIQ that they transition him to an individual-contributor engineering role, have AIQ management take over responsibility for the remaining team and, if they wished, AIQ could terminate the two employees. AIQ agreed and, in March 2026, Mr. Officer transitioned from President of Engineering to an individual-contributor engineering role without direct reports. His technical responsibilities remained largely the same: he continued developing features, handling operational and production work, and managing releases until his termination in April 2026.

**D. AIQ's Ecommerce Business Struggles Under Paschal's Leadership**

38. AIQ's Ecommerce business (the business that was formerly "Dispense") struggled after the acquisition under Paschal's leadership. Under Paschal's direction, the ecommerce engineering team spent more than a year building non-cannabis features, but no sales

materialized. For example, after Paschal developed an interest in golf, he tried to expand AIQ Ecommerce into a platform for golf. That venture was short-lived and never led to any sales. Paschal also directed many other similarly unsuccessful forays, e.g., coffee shops, restaurants, skincare, and medical spas. After the acquisition of Dispense, AIQ lost nearly half of Dispense's former business, including its largest cannabis customer, because Paschal failed to continue developing Dispense's legacy cannabis-specific business.

39. There were other problems at AIQ aside from Paschal's poor management of the legacy Dispense business. For example, Mr. Officer was concerned about the security and scalability of AIQ's backend systems. In December 2025, he communicated his concerns about AIQ's compliance with the Health Insurance Portability and Accountability Act of 1996 and with System and Organization Controls 2 standards to Paschal and Abid (AIQ's CTO), but his concerns were ignored.

40. The scalability concerns came to a head on April 20, 2026 when, due to backend issues that Mr. Officer had previously identified to AIQ and which had never been addressed, AIQ's backend systems completely crashed on the largest day of business in the cannabis industry. Mr. Officer's repeated critiques of AIQ's unprofessional data management and security practices created significant tension with AIQ's leadership and drew Paschal's animosity.

**E. Ms. Moore and Mr. Officer Help AIQ Try to Expand into the Nightlife Industry**

41. Despite Paschal's mismanagement of the legacy Dispense business, Ms. Moore and Mr. Officer worked hard to try to make AIQ a success, including helping AIQ try to expand into the nightlife marketing business. Ms. Moore provided AIQ with a list of Tablelist's customers — customers Ms. Moore had acquired by virtue of her reputation and strong relationships she developed over many years in the industry. She also introduced numerous

Tablelist customers to AIQ, facilitated calls between AIQ and Tablelist's customers, and arranged for West Paschal to conduct demonstrations of AIQ for Tablelist's customers.

42. Likewise, at the direction of AIQ's senior executives — including Paschal, Abid, and Chief Revenue Officer Brian Geddes — Mr. Officer built an integration between Tablelist and AIQ so that AIQ could recruit existing Tablelist customers to AIQ's marketing and loyalty business, thereby expanding AIQ into the nightlife and hospitality space. Many other AIQ employees were involved in or aware of this project, including West Paschal, AIQ co-founder and Chief Expansion Officer, Chief Operating Officer Lynch, frontend lead Brynner Doyle, backend lead Robert Lappert, and AIQ's product and marketing teams. The integration required that Tablelist connect to AIQ's application programming interface ("API"); an API is a software tool that allows two applications to share data with one another. Connecting Tablelist to AIQ's API required an API Key (a type of digital password), which Mr. Officer received from AIQ senior product manager Kevin Bowman. As part of the integration, Mr. Officer also added an AIQ icon to Tablelist to assist its customers in connecting to AIQ.

**F. After Taking Advantage of Ms. Moore's and Mr. Officer's Expertise and Relationship in the Nightlife Industry, Paschal Fired Ms. Moore and Mr. Officer and Gratuitously Defamed Them**

43. On April 30, 2026, without any warning or notice, AIQ abruptly terminated Ms. Moore and Mr. Officer's employment, falsely asserting that Mr. Officer had stolen AIQ's code — but without any specifics. AIQ also terminated the employment of Mr. Officer's wife, Chelsea Officer, who was the Senior Vice President of Product at AIQ overseeing all products at the company, including marketing, loyalty, and ecommerce. While informing Ms. Moore and Mr. Officer of their terminations, Lynch accused them of a major breach of contract and accused Mr.

Officer of having stolen code from AIQ. Lynch made these same statements to Chelsea Officer — about her husband — when terminating Ms. Officer.

44. It was bad enough that AIQ fired Ms. Moore and Mr. Officer under false pretenses. However, Paschal's conduct got far worse and more damaging to Ms. Moore and Mr. Officer.

45. That same day (April 30, 2026) Paschal, AIQ's Chief Executive Officer, maliciously defamed Ms. Moore and Mr. Officer by sending a company-wide message to approximately 100 AIQ employees accusing Ms. Moore and Mr. Officer of wrongdoing. Through this message — which spread like wildfire both inside and outside AIQ — Paschal knowingly, recklessly, negligently, and falsely stated that Ms. Moore and Mr. Officer had engaged in misconduct, including allegedly: (a) taking AIQ code and using it "within a third-party platform where it should not exist"; (b) taking code that was "built exclusively for AIQ" between 2024 and 2026; (c) engaging in a "clear violation of [their] agreements and a serious breach of trust"; (d) failing to "protect the company, [AIQ's] customers, and the work" that AIQ's employees engage in; and (e) putting the "integrity" of AIQ and its "IP" and "customers" "at risk." A screenshot of Paschal's full message is appended as Exhibit 1.

46. Paschal ham-handedly sought to protect himself and AIQ from liability for defamation by not specifically using Ms. Moore and Mr. Officer's names in his message. But everyone understood that his message referred to Ms. Moore and Mr. Officer given that Ms. Moore and Mr. Officer were fired on the same day. Moreover, the message stated that, as a result of the terminations, Abid would be taking a more active ecommerce engineering role — which had been *Mr. Officer*'s role.

47. AIQ's staff immediately knew that Paschal's defamatory statements were about Ms. Moore and Mr. Officer, and they began spreading them. As one AIQ employee put it, in writing to a third party, "Chelsea [Mr. Officer's wife] got fired today and for big ass reasons[.] Kyla & Tim as I'm sure u know own Tab[l]elist, which is now the nightlife company we're working with to expand into club / venue space. Well, turns out, Chelsea has been stealing AIQ code and 100% replicating it verbatim into a nightlife CRM since 2024. *They were caught this week and all let go today. Big lawsuit pending. But NO MORE CHELSEA, no more Kyla, no more Tim*[.]" (emphasis added).

48. Another AIQ employee messaged the same third party that "[t]he thing is Nick [Paschal] made a whole post internally about it and now it feels like *everyone has a bad taste in their mouth about tim and chels*. Which fuckign [sic] sucks. I was just on a call with a few Engineers and that's the vibe I'm getting[.]" (emphasis added).

**G. Mr. Paschal and AIQ Harass Ms. Moore and Mr. Officer After their Termination and Embark on a Failed Search to Support Paschal's False Statements About Ms. Moore and Mr. Officer**

49. Ms. Moore and Mr. Officer were shocked by their terminations and they had no idea what "code" Paschal believed they allegedly had misappropriated from AIQ to use for Tablelist. Also, the accusation made no sense for multiple reasons. First, Ms. Moore and Mr. Officer are substantial shareholders of AIQ and were highly incentivized to help grow the company, not steal from it. Second, Ms. Moore and Mr. Officer were providing AIQ with business and customer leads from Tablelist, which was the opposite of trying to undermine it. Third, Mr. Officer created both the Tablelist and AIQ Ecommerce codes, so he didn't need to "steal" anything. Fourth, Tablelist's code was very similar to Dispense/AIQ Ecommerce's code because the latter had been based upon the former. Fifth, the Employment and Confidentiality

Agreements had specifically carved out both their work for Tablelist as well as its intellectual property. Sixth, Mr. Officer also had been working to *integrate* the Tablelist and AIQ codes in accordance with Paschal's own directive, which had required connection between the two codes. Seventh, Tablelist and AIQ did not even compete with one another, so it would make no sense for Ms. Moore or Mr. Officer to try to steal AIQ's code. Finally, with respect to Ms. Moore, it was impossible for her to steal AIQ's code because she is not a programmer, does not know how to code or steal code, did not have access to AIQ's code, and has never written any code for either AIQ or Tablelist.

50. Accordingly, Ms. Moore and Mr. Officer immediately requested that AIQ disclose the purportedly misappropriated code. AIQ refused. Indeed, despite their repeated requests for months and months thereafter that AIQ identify the specific code that AIQ had falsely asserted had been "stolen," to this day AIQ has failed to disclose the specific codes it had asserted were misappropriated from AIQ.

51. Instead, AIQ harassed Ms. Moore and Mr. Officer. AIQ had strangers, unannounced, show up at both Ms. Moore's and Mr. Officer's houses. At the time, both families had young children at home. The strangers did not say who they were and did not show any identification. They just said that AIQ had sent them to obtain AIQ's property. AIQ also sent accusatory litigation-hold letters to Ms. Moore and Mr. and Mrs. Officer.

52. AIQ subsequently engaged in a fruitless search to try to find support for their defamatory statements but came up empty. They became so desperate that they even suggested that Mr. Officer and his wife used an SD card (which is a small storage card typically used for pictures) to misappropriate code when, in reality, they put the SD card in a laptop to upload family photographs.

53. While AIQ refused to disclose the specific code that was at issue, AIQ mentioned five categories of purportedly copyrighted code that they asserted were stolen, none of which stood up to scrutiny. First, AIQ asserted that Tablelist contained an API key and AIQ icon. However, as discussed in paragraph 42 above, the API key and icon were added to Tablelist as part of the planned integration between Tablelist and AIQ that was approved of and overseen by Paschal. In fact, on April 21 — nine days before defaming Ms. Moore and Mr. Officer — Paschal requested Tablelist login credentials from Mr. Officer so he could review the Tablelist/AIQ integration. Mr. Officer readily provided Paschal with the Tablelist login credentials. Paschal reviewed the Tablelist/AIQ integration and, thus, knew that the API key and icon were added to Tablelist as part of the integration, or acted with reckless disregard thereto. Also on April 21, a second AIQ employee reviewed the Tablelist/AIQ integration using the credential Mr. Officer had provided to Paschal and, thus, he also knew that the API key and icon was added to Tablelist as part of the planned integration, or acted with reckless disregard thereto. The bottom line is that neither Ms. Moore nor Mr. Officer had engaged in any misconduct in connection with that API key and icon.

54. Second, AIQ asserted that Tablelist and AIQ's Ecommerce platform have the same internal messaging infrastructure, called a publisher/subscriber ("Pub/Sub") infrastructure. However, as Defendants were aware, Tablelist's Pub/Sub infrastructure *predates* AIQ's Ecommerce infrastructure and the two platforms have the same Pub/Sub infrastructure because AIQ's Ecommerce platform, which was formerly Dispense, was forked from Tablelist.

55. Third, AIQ asserted that Tablelist and AIQ's Ecommerce platform have similar custom-built messaging classes, notification systems, and data structures. As with the Pub/Sub infrastructure, each of those capabilities originated within Tablelist and was inherited by AIQ's

Ecommerce platform from Tablelist. Further, as allowed by his Employment and Confidentiality Agreements, Mr. Officer continued to update Tablelist's code and AIQ's code after Dispense merged with AIQ. He never stole anything from AIQ.

56. Fourth, AIQ asserted that certain unspecified internal quality-assurance testing identifiers, called "data-testid values," appear in both Tablelist and AIQ's Ecommerce platform. As an initial matter, there is nothing proprietary about data-testid values — they have no connections to any features on a platform or client data. It also should be no surprise that quality assurance items like data-testid values — which Mr. Officer created for *both* Tablelist and AIQ — reflect a consistent development and testing pattern he uses across projects.

57. Fifth, AIQ asserted that certain unspecified text with idiosyncratic phrasing and internal admin copy authored by unidentified Alpine IQ personnel were also in Tablelist. Again, it should be no surprise that there is overlap since Mr. Officer was the common author of millions of lines of code for both AIQ and Tablelist and he continuously updated both codes.

58. In sum, after stonewalling for months and searching desperately for a justification supporting Paschal's false and defamatory statements about Ms. Moore and Mr. Officer misappropriating AIQ's code and intellectual property, the best AIQ and Paschal could come up with was code that was forked from Tablelist to Dispense, contained similarities from common authorship, or was added to Tablelist as part of the integration exercise that Paschal himself had directed. Simply put, neither Ms. Moore nor Mr. Officer ever misappropriated any code from AIQ.

**H. Ms. Moore's and Mr. Officer's Injuries Caused by Defendants' Defamation**

59. Defendants' defamatory statements were directed towards Ms. Moore's and Mr. Officer's trade and professions and falsely accused them of fraudulent and improper conduct.

The defamatory statements harmed Ms. Moore's and Mr. Officer's reputations in their trade and profession.

60. Defendants' defamatory statements caused Ms. Moore and Mr. Officer mental anguish and emotional distress from having their reputations damaged and being falsely accused of fraudulent conduct, which was exacerbated by Defendants' harassment of them after the termination of their employment.

61. Defendants' defamatory statements also caused Ms. Moore and Mr. Officer to suffer actual damages resulting from the impairment of their reputations, mental and emotional anguish and suffering, and loss of income and business opportunities in an amount in excess of $75,000 to be proven at trial.

**COUNT ONE**

**(Libel Per Se and Per Quod)**

62. Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

63. On April 30, 2026, Paschal, AIQ's Chief Executive Officer, knowingly, recklessly, negligently, and falsely sent a message to approximately 100 AIQ employees accusing Ms. Moore and Mr. Officer of (a) taking AIQ code and using it "within a third-party platform where it should not exist"; (b) taking AIQ code that was "built exclusively for AIQ" between 2024 and 2026; (c) engaging in a "clear violation of [their] agreements and a serious breach of trust"; (d) failing to "protect the company, [AIQ's] customers, and the work" that AIQ's employees engage in; and (e) putting the "integrity" of AIQ and its "IP" and "customers" "at risk." Defendants' statements have been republished by AIQ's employees to third parties. The republications by third parties of Paschal's statements were foreseeable due to the large number of people that the

information was shared with, Plaintiffs' prominent roles at AIQ, and the salacious nature of the claims, and are attributable to Defendants.

64. Plaintiffs are not public officials or public figures. Defendants' statements do not relate to an issue of public interest.

65. The defamatory meaning of Defendants' false statements about Ms. Moore and Mr. Officer is apparent from the face of their publication and was understood to be about Ms. Moore and Mr. Officer. The statements were defamatory *per se* as they inherently injured Ms. Moore's and Mr. Officer's reputations in their business, trade, profession, or office and accused them of improper conduct.

66. Defendants intended to cause harm to Plaintiffs' pecuniary interests, or either recognized or should have recognized their defamatory statements were likely to do so.

67. Defendants published their false statements knowingly, recklessly, negligently, falsely, with actual malice, and without any credible bases. Indeed, Defendants failed to contact and question obvious and available sources of information, including Ms. Moore and Mr. Officer themselves, *prior to* making the defamatory statements and published their allegations in a manner calculated to create a false inference. Furthermore, a simple review of the AIQ Ecommerce code history, and the dates set forth therein, would have shown that the AIQ code that Defendants asserted had been stolen *post-dated* the analogous Tablelist code.

68. Although damages are presumed, as a direct and proximate result of Defendants' conduct, Mr. Officer and Ms. Moore have suffered significant actual and special damages, including, without limitation, harm to their reputations, personal humiliation, mental anguish and suffering, lost earnings, emotional distress, overwhelming stress and anxiety, and other pecuniary loss in an amount to be proven at trial.

**COUNT TWO**

**(Declaratory Judgment (28 U.S.C. § 2201))**

69. Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

70. Defendants have alleged and continue to allege that Plaintiffs have misappropriated AIQ's code, violated AIQ's copyrights, and breached their Employment and Confidential Information and Invention Assignment Agreements.

71. Plaintiffs have never misappropriated AIQ's code, violated Defendants' copyrights or breached their Employment and Confidential Information and Invention Assignment Agreements.

72. An actual controversy exists between Plaintiffs and Defendants concerning the parties' respective rights and obligations under the U.S. Copyright Act of 1976 and under the Employment and Confidential Information and Invention Assignment Agreements. As parties to the agreements, Plaintiffs have a legally protected interest in the construction of their terms, and the parties' opposing positions have created a present and definite controversy that has injured Plaintiffs. This is not a hypothetical or speculative disagreement; the controversy is ripe, and a judicial declaration is necessary to resolve the parties' rights and to avoid imminent litigation. Declaratory relief is necessary and appropriate so that Plaintiffs may ascertain their rights.

73. Plaintiffs request a declaration that they did not (i) misappropriate AIQ's code, (ii) infringe any of AIQ's copyrights in its code, or (iii) breach the Employment and Confidential Information and Invention Assignment Agreements.

74. The requested declaration will terminate the controversy and remove the uncertainty between the parties concerning their rights.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

a. Entry of Judgment in favor of Plaintiffs and against each Defendant;

b. Damages for economic, noneconomic, actual, and special damages, including, but not limited to, impairment of the Plaintiffs' reputations, mental anguish and suffering, and loss of income, profit, and business opportunities;

c. A declaration that Plaintiffs did not (i) misappropriate any AIQ code; (ii) infringe any of AIQ's copyrights in its code; or (iii) breach the Employment and Confidential Information and Invention Assignment Agreements;

d. Pre- and post-judgment interest as allowable by law;

e. Reasonable costs and attorney fees to the extent permitted at law or in equity;

f. Punitive damages;

g. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury for all issues so triable.

Dated: August 25, 2026

Respectfully submitted,

Marc E. Bernstein
Ryan A. Kane
Reuben R. Bauer
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue – 12th Floor
New York, New York 10110
Telephone: (212) 382-3300
mbernstein@wmd-law.com
rkane@wmd-law.com
rbauer@wmd-law.com

Michael A. Rollin
Lindsey D. Idelberg
Foster Graham Milstein & Calisher, LLP
360 S. Garfield Street – 6th Floor
Denver, Colorado 80209
Telephone: (303) 319-8346
mrollin@fostergraham.com
lidelberg@fostergraham.com